**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**DAVIDA NICOLE DINGESS,**

     **Plaintiff,**

v.                             **Case No.: 2:15-cv-09640**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 10).

The undersigned has thoroughly considered the evidence and the applicable law. For the following reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED;** this matter be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and this action be **DISMISSED, with**

1

**prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On October 11, 2012, Plaintiff, Davida Nicole Dingess ("Claimant"), completed an application for DIB, alleging a disability onset date of June 28, 2010, due to post-traumatic stress disorder ("PTSD"), major depression, osteoarthritis, bad knees-no cartilage, degenerative disk disease, previous back injuries, and hypothyroidism. (Tr. at 152-53, 188). Her application was denied initially and upon reconsideration. (Tr. at 10). Claimant requested and received a hearing before the Honorable Michele M. Kelley, Administrative Law Judge ("ALJ"), who determined on October 20, 2014 that Claimant was not disabled under the Social Security Act. (Tr. at 10-25). The ALJ's decision became the final decision of the Commissioner on May 14, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Claimant filed a Memorandum in Support of Judgment on the Pleadings, and Defendant filed a Brief in Support of Defendant's Decision. (ECF Nos. 7, 10). Consequently, the matter is ready for resolution.

## II.    Claimant's Background

Claimant was 39 years old at the time she filed the instant application for benefits and 41 years old at the time of the ALJ's decision. (Tr. at 185). Claimant is a high school graduate and communicates in English. (Tr. at 24). Her prior relevant work experience includes jobs as a cash vault supervisor, an armored car guard and messenger, and a military police officer. (Tr. at 23). Claimant served a total of six years in the Army during the Gulf War Era, from October 7, 1994 to October 6, 1999 and from February 24, 2003

to May 10, 2004. (Tr. at 167).

III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability,

3

and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and

the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 28, 2010, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "asthma, osteoarthritis of both knees, posttraumatic stress disorder, depression, and anxiety." (Tr. at 12-13, Finding No. 3). The ALJ considered Claimant's other medically determinable impairments of degenerative disk disease, obstructive sleep apnea, hypertension, hypothyroidism, diabetes mellitus, and obesity, but decided that these conditions were non-severe. (Tr. at 13).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 13-15, Finding No. 4). Accordingly, the ALJ determined Claimant's RFC, concluding that she had:

> [T]he residual functional capacity to lift, carry, push, and pull 10 pounds occasionally, less than 10 pounds frequently; stand and walk for a total of four hours during an eight hour workday; sit for a total of six hours during an eight hour workday; occasionally climb ramps and stairs; occasionally balance, stoop, and crouch; never kneel or crawl; never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to temperature extremes, humidity, wetness, vibration, fumes, odors, dusts, gases, and poor ventilation; must avoid even moderate (interpreted as no exposure) exposure to hazards such as unprotected heights, uneven surfaces, and

5

> inherently dangerous machinery; can understand, remember, and carry out three to four step instructions; sustain attention, concentration, and persistence for two hour segments, eight hours a day, five days a week; can tolerate changes in a typical work setting; can tolerate occasional interaction with supervisors and coworkers; cannot work in tandem with others; cannot interact with the public; cannot work at fixed production rate quotas, but can do goal oriented work; can make judgments and decisions in simple and detailed work situations, but not complex work situations.

(Tr. at 15-23, Finding No. 5). At the fourth inquiry, with the assistance of a vocational expert, the ALJ found that Claimant was not capable of performing her past relevant work. (Tr. at 23, Finding No. 6). Therefore, under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 23-25, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1973, and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 23-24, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as an inspector, sorter, and assembler at the sedentary exertional level. (Tr. at 24, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act through the date of the decision. (Tr. at 25, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant raises one challenge to the Commissioner's decision. Claimant contends that the ALJ committed reversible error in her social security disability analysis by failing

to assign proper weight to disability determinations issued by the Department of Veterans Affairs ("VA") beginning in 2005. According to Claimant, the VA ultimately awarded her a permanent 70% service-connected disability rating for PTSD effective June 6, 2013,[1] 40% service-connected disability rating for degenerative changes to her lumbar spine effective June 26, 2007, and 10% service-connected disability rating for left knee arthralgia effective April 16, 2005, for a total permanent VA disability rating of 90%. Furthermore, the VA granted Claimant "individual unemployability" and paid benefits to her at the 100% rate. (ECF No. 7 at 8, Tr. at 163). Claimant argues that the ALJ was bound by this circuit's precedent to give the VA disability ratings substantial weight unless the record clearly demonstrated that the ratings deserved less than substantial weight. In the event the ALJ gave the VA ratings anything less than substantial weight, Claimant contends that the ALJ was obligated to explain the reasons for the weight given. Claimant asserts that the ALJ afforded the VA ratings "little weight" without articulating how the record clearly supported her decision to deviate from the "substantial weight" requirement.

In response, the Commissioner argues that the ALJ complied with applicable law in assessing the weight to afford the VA's disability ratings. (ECF No. 10 at 12). The Commissioner stresses that the ALJ provided specific reasons for discounting the weight of the VA's ratings, noting that they were inconsistent with Claimant's daily activities, with her positive response to mental health treatment, and with the opinions of the state agency consultants who found Claimant capable of performing sedentary work with

---

[1] Actually, Claimant already had a 70% service-connected disability rating for PTSD in 2011 and 2012, (*See* Tr. at 168, 346), which was reaffirmed in 2014 when Claimant's basic eligibility for Dependents' Educational Assistance was established, effective June 6, 2013. (Tr. at 163). Prior to 2011, Claimant had a disability rating of 50% for PTSD.

certain nonexertional restrictions. Therefore, the Commissioner claims that the ALJ's decision is supported by substantial evidence.

## V.   Relevant Medical History

The undersigned has reviewed the evidence in its entirety, including all of the medical records. However, given the specificity of Claimant's challenge to the ALJ's decision, only records most central to the dispute are discussed below.

### A. Treatment Records from the Department of Veterans Affairs

### 1. *PTSD*

On October 4, 2004, Claimant was evaluated for PTSD at the VA's mental health clinic in Charleston, West Virginia after she received a positive score on a PTSD screening tool administered by her primary care physician. (Tr. at 285-86). Mary Smith-Wilson, a Master's Degree-level social worker, conducted the evaluation. Claimant described her current symptoms as anger outbursts, irritability, restless sleep and sleep disturbances, fatigue, difficulty discussing her military experience, hypervigilance, nightmares involving explosions and gunfire, crying bouts, and overwhelming feelings of sadness. (Tr. at 285). Claimant reported serving in the active duty U.S. Army from 1994-1999 and then serving in the National Guard since 1999. In February 2003, Claimant was sent to Iraq and served in combat duty for one year. During that time period, she was involved in a "fake bomb scare" during which she was riding in a convoy when a road side bomb exploded. Although no one was injured, Claimant was extremely frightened. Claimant, who was a military police officer and trained Iraqi police, felt that her life "was threatened daily." (*Id.*). Claimant returned from Iraq in May 2004 and was currently working as a guard for an armored car company. Claimant had a high school diploma and an Associate Degree in Art. (Tr. at 286).

Claimant indicated that she and her five-year old son were presently living with her mother and step-father. (Tr. at 286). Her biological father, a Vietnam veteran, had committed suicide years earlier. Claimant denied using alcohol or illicit drugs and stated that her Christian faith was an important part of her life. Claimant's history of mental health treatment was limited to outpatient therapy that she had received in 1995 after the end of a romantic relationship. Claimant did not have suicidal or homicidal ideations, although she admitted to occasional thoughts of suicide, but without a plan. Claimant also admitted to auditory hallucinations in which she heard explosions. Claimant was assessed with "rule out PTSD" and was referred to the Huntington VAMC mental health clinic for intake, further evaluation, and assessment. She was also referred to the Charleston Vet Center for counseling. Her Global Assessment of Functioning ("GAF") score was 68.[2]

Claimant had one additional mental health visit in 2004. (Tr. at 662-67). On December 22, 2004, Claimant saw James M. Morrison, Supervisory Social Worker, for a comprehensive mental health assessment/evaluation. Claimant repeated her symptoms, stressing her recent nightmares involving gunfire and explosions. She described the dreams as realistic, causing her to awaken, screaming and startled, with her heart racing. (Tr. at 662). Claimant indicated that she could not discuss her experiences in Iraq without getting upset, and she avoided listening to any news reports about Iraq. She reported that

---

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. A GAF score between 61-70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well and has some meaningful interpersonal relationships.

her father, a Vietnam veteran, had suffered from PTSD and ultimately committed suicide. (Tr. at 663). With respect to her physical health, Claimant stated that her hearing was bad, and she injured her back while in Iraq. She had bursitis in her knees, back, and hips for which she took Celebrex, and she received Synthroid for hypothyroidism. Claimant's mental status examination was normal except her affect was restricted, and her mood was depressed. (Tr. at 666). Mr. Morrison diagnosed Claimant with PTSD and assessed her level of functioning as moderately impaired due to "recent combat exposure and readjustment." (Tr. at 667). He recommended medication and therapy, with six months to be the target date upon which to achieve the goals of improved sleep and decreased nightmares. Claimant saw a staff psychiatrist that same day and was given prescriptions for Prozac and Trazadone. (Tr. at 662).

According to the record, Claimant had one psychotherapy session in 2005, (Tr. at 660-61), and no mental health treatment at the VA in 2006. In February 2007, Claimant reestablished care by attending a psychotherapy session with Mary Smith-Wilson, MSW. (Tr. at 608-10). Claimant explained that she was now ready to commit to psychological treatment. She had been afraid to take the medications previously prescribed to her due to potential side effects that might interfere with her job as an armored car guard for Brinks Security Company. However, Claimant reported an increase in her symptoms since 2005, especially in her anger outbursts, irritability, anxiety, and depression. She had gained a significant amount of weight and was experiencing chronic pain in her back, legs, and hips. Her job had become very demanding, requiring 60-70 hours per week, leaving her with very little time to herself. She had begun to withdraw socially and had stopped attending church. Claimant indicated that she had become hypervigilant with an overactive startle response. She had flashbacks triggered by loud noises, and her co-

workers commented on her "spacing out." (Tr. at 609). Claimant stated that she had a brother in the military, and she was very worried that he was going to be sent to Iraq. She was also worried that she would lose her job due to the symptoms associated with her PTSD. Ms. Smith-Wilson assessed Claimant with PTSD and recommended that she promptly begin medications and resume therapy. She gave Claimant a GAF score of 62.

Claimant was seen for psychotherapy and psychotropic medication reconciliation another eight times in 2007. In addition, she underwent a compensation and pension ("C & P") examination to determine whether she had a service-connected disability related to PTSD, and if so, the percentage rating of disability. Claimant was given four more GAF scores at these visits. Her therapist, Ms. Smith-Wilson, assessed Claimant's functioning at 58[3] in March and May 2007, and at 55 in June 2007. (Tr. at 586, 593, 599). Roslyn Feierstein, Ph.D., Licensed Clinical Psychologist, gave Claimant a GAF score of 60 at the C & P examination on June 26, 2007. (Tr. at 579).

Claimant had seven mental health visits at the VA in 2008. During this period, her GAF scores ranged from a low of 50[4] to a high of 65. (Tr. at 523, 538, 541, 545). Claimant's highest GAF score was given on February 1, 2008 by Ms. Smith-Wilson, and her lowest score was given on September 10, 2008 by Belen Bushman, an Advanced Practice Nurse Practitioner. (Tr. at 523, 545). Perhaps indicative of the GAF scale's "conceptual lack of clarity" and "questionable psychometrics in routine practice," a mere three hours before

---

[3] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[4] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

Nurse Bushman assessed Claimant's GAF score at 50, Claimant was seen by Lori Adkins, Clinical Social Worker, who assigned Claimant a GAF score of 60. *See* DSM-5 at pg. 16.

Claimant met with Ms. Adkins on September 10, 2008 to discuss transferring from Charleston's outpatient VA facility to Huntington's VAMC due to Charleston's loss of its only psychiatrist. (Tr. at 523-24). Ms. Adkins noted that Claimant had received a 50% service-connected disability rating from the VA associated with PTSD, and she also had a diagnosis of anxiety disorder. Claimant reported an increase in symptoms with a recent hospitalization for chest pains that were eventually determined to be panic attacks. Ms. Adkins felt Claimant should speak with someone from the VA's PTSD team. Accordingly, Megan L. Green, Psy.D., agreed to consult with Claimant. (Tr. at 523). After one cancellation by Claimant, that consultation occurred on October 30, 2008. (Tr. at 514-15). At the conclusion of their session, Dr. Green felt Claimant would benefit from PTSD education and psychotherapy every three weeks. (Tr. at 515).

Claimant returned to the VA mental health clinic ten times in 2009. She continued to suffer from the same symptoms of PTSD; including anxiety, depression, fatigue, sleep disturbances, nightmares, auditory hallucinations, intrusive memories, and feelings of being overwhelmed. Claimant received two GAF scores during the year. On June 12 and September 11, 2009, Dr. Green gave Claimant a GAF score of 55, reflecting moderate symptoms.

In 2010, Claimant sought treatment for PTSD on seven occasions and received a C & P examination to evaluate the propriety of her 50% disability rating. On March 12, 2010, Claimant and an interdisciplinary treatment team including Claimant's primary provider, Dr. Green, developed a recovery focused treatment plan for Claimant. (Tr. at 427-32). They identified Claimant's major symptoms as depression, severe anxiety, decreased

energy, decreased concentration, sleep disturbance, recurrent nightmares, avoidance behavior, blunting of emotions, persistent anger and aggression, social isolation and alienation, and the re-experiencing of traumatic events. (Tr. at 429). The team set specific goals for Claimant to achieve; such as, reducing anxiety by 100%, creating a coping strategy card listing strategies, and increasing the amount of time Claimant stayed in a group setting by 25%. The team also discussed Claimant's symptoms of depressive disorder and set specific goals related to that impairment. (Tr. at 430). Claimant was given a GAF score of 60.

On June 25, 2010, three days before the alleged onset of disability, Claimant reported to Dr. Green that she had lost her job at Brinks. (Tr. at 416). Claimant explained that she had been suspended until yesterday and was forced to resign effective today to avoid being fired. She stated that her problems at work stemmed from her inability to concentrate and her failure to remember to do important things. Claimant's biggest concern was about the direction her life would take now that she was unemployed, because she had never been without a job. A case worker was brought into the session to discuss vocational rehabilitation and education options for Claimant.

Claimant returned to the mental health clinic on July 30, 2010 and reported to Dr. Green that she had gotten married in the weeks since her last session. (Tr. at 414). Claimant admitted that her romantic relationship with her husband had been brief and that they had married on a "whim," but she indicated that she was "ready for someone to take care" of her. Dr. Green discussed at length the role that mental health symptoms play in relationship functioning. Claimant admitted that she had not told her husband anything about her experiences in the military and had withheld information from him about the type of treatment she was receiving at the VA. Dr. Green discussed

communication issues with Claimant and the consequences of withholding important information from a spouse.

On August 4, 2010, Claimant called the mental health clinic to advise that she was pregnant. (Tr. at 413). Claimant was concerned about how her psychotropic medications would affect the fetus. She was instructed to discuss her medications with her obstetrician. On September 17, 2010, Claimant informed Ms. Green that she had stopped taking her medications due to the pregnancy, and she was beginning to experience sleep disturbance. (Tr. at 411-12). Ms. Green again suggested that Claimant discuss this problem with her obstetrician. Claimant's GAF score on this visit was 50.

In 2011, Claimant had just one visit at the VA mental health clinic. According to an April 21, 2011 administrative note prepared by Amanda Barrett, R.N., Nurse Barrett had attempted to speak with Claimant by telephone on three occasions about whether Claimant intended to continue with mental health services and had left messages for Claimant to call back. (Tr. at 378). Nurse Barrett wanted to inform Claimant that Dr. Green was no longer seeing patients for individual therapy, and Claimant would have to see another provider. However, Claimant had not returned the calls. Accordingly, Nurse Barrett sent Claimant a letter providing that information. On April 29, 2011, Claimant called Nurse Barrett and asked to have an appointment scheduled. (Tr. at 377).

On May 18, 2011, Claimant returned to the clinic and underwent a comprehensive mental health evaluation, performed by Billy Rutherford, Psy.D., for intake to the Posttraumatic Stress Disorder Clinical Team ("PCT"). (Tr. at 367-77). Claimant's primary complaint was of disturbed sleep, some of which she attributed to having a new baby and some of which related to her chronic PTSD. (Tr. at 368). Claimant described traumatic experiences associated with her tour in Iraq, indicating that she dreamt about her

14

experiences once or twice per week. She awoke from sleep at least once per week feeling startled, disoriented, and sweating. Claimant stated that she was recently married, about one year earlier, and had also lost her job, but was somewhat relieved about that due to having less reminders of her security position in the service. Claimant stated that she intentionally stayed home to reduce her exposure to stimuli that would trigger memories, and she avoided any news reports. She described feeling nervous and jumpy, with crying spells and occasional feelings of helplessness and hopelessness. (Tr. at 368-69). Dr. Rutherford performed a mental status examination, finding Claimant to be dressed and groomed appropriately and to display normal attitude, behavior, and speech. (Tr. at 375). Her mood was anxious, and she reported difficulty concentrating on tasks when in a work environment, but the remainder of the examination was within normal limits. (Tr. at 375-76). Dr. Rutherford diagnosed Claimant with chronic PTSD and gave her a GAF score of 60. He felt Claimant would benefit from therapy designed to decrease her PTSD symptoms to a sub-clinical level. (Tr. at 377).

In 2012, Claimant had eleven mental health visits at the VA and one C & P examination to evaluate her PTSD disability rating. Of particular note are the following visits. On May 23, 2012, Claimant was assigned a new mental health treatment coordinator, Amy McQuade, Licensed Independent Clinical Social Worker ("LICSW"). (Tr. at 347). That same day, Ms. McQuade screened Claimant for depression, and found her to be severely depressed. (Tr. at 349). A PTSD screening test was also notably positive. Claimant reported that her symptoms of PTSD had worsened recently due to family stressors. (Tr. at 353). Her symptoms included fragmented sleep, exaggerated startle response, depressed mood, and poor energy. Claimant indicated that she had married two years earlier, and her marriage was good; however, she was concerned about her

increasing inability to complete her activities of daily living. She stated that she found it difficult to care for both children and for her parents, who needed her daily assistance. Her father was in a rehabilitation facility, and her mother had been hospitalized three times in the recent past. Ms. McQuade documented that Claimant had not received mental health treatment for a while and felt that she needed to begin therapy again and receive psychotropic medications. Claimant traced the source of her PTSD to an IED explosion and "another incident" that occurred when Claimant was on active duty. (Tr. at 354). Ms. McQuade diagnosed Claimant with PTSD by history and depression secondary to PTSD. She gave Claimant a GAF score of 50. Ms. McQuade recommended that Claimant see a psychiatrist for medication and continue with therapy every 1-2 weeks. Claimant was given literature about evidence-based therapy ("EBT") to consider other treatment options.

On June 5, 2012, Claimant saw Dr. Sandra Skar for a medication review and evaluation. (Tr. at 345-47). Dr. Skar noted that Claimant had previously been on several medications to treat her symptoms of PTSD, but had discontinued the medications when she became pregnant in 2010. Claimant had started to experience worsening mood and sleep symptoms and felt she needed to re-start medication. Claimant denied having suicidal ideations, but admitted to having suicidal thoughts and auditory hallucinations. Dr. Skar reviewed Claimant psychiatric history, confirming that she had received outpatient therapy since 2008, but had never required hospitalization for psychiatric symptoms. (Tr. at 346). Claimant was married with two children, a boy aged 12 years and a boy aged 14 months. She was currently unemployed. Dr. Skar decided to start Claimant on Prozac, Trazadone, and Topiramate. Claimant was instructed to abstain from alcohol and to return for supportive therapy. Dr. Skar gave Claimant a GAF score of 60.

16

On June 15, 2012, Claimant was seen by Amy McQuade for PTSD supportive therapy. (Tr. at 338-40). Claimant described a second traumatic experience in Iraq involving a mortar explosion that occurred near a guard tower at which Claimant was stationed. (Tr. at 339). Claimant displayed significant hyper-arousal when recalling the experience, breathing heavily, flushing, and becoming tearful. Ms. McQuade encouraged Claimant to consider EBT treatments, prolonged exposure ("PE") and cognitive processing therapy ("CPT") to help her overcome her PTSD. Claimant was given information regarding these treatments. Ms. McQuade diagnosed Claimant with PTSD and depression secondary to PTSD, and gave her a GAF score of 50.

Claimant saw Dr. Skar on July 6, 2012 for a medication evaluation. (Tr. at 336-37). Her condition was essentially the same, as was her diagnosis. Dr. Skar gave Claimant a GAF score of 60, and increased her medications. (Tr. at 337).

On July 20, 2012, Claimant was seen by Ms. McQuade. (Tr. at 319-20). Claimant agreed with Ms. McQuade that after years of participating in supportive therapy for PTSD, Claimant had seen very little improvement in her symptoms. (Tr. at 319). Ms. McQuade again suggested that Claimant consider EBT, although Claimant was somewhat fearful of it. Claimant expressed interest in learning more about EBT and agreed to participate in an educational offering on trauma and EBT. Ms. McQuade scored Claimant's GAF at 50 and recommended that she return for therapy after completing the educational session. (Tr. at 320).

In 2013, Claimant kept seven appointments with the mental health clinic. On January 18, 2013, Dr. Skar evaluated Claimant for medication review. (Tr. at 699-702). Claimant reported that her mother had died one month earlier, and Claimant was having trouble coping with the loss. (Tr. at 699). She was having sleeping difficulties, and her

mood had worsened. Dr. Skar decided to increase Claimant's Prozac dosage and continue her other medications. Dr. Skar advised Claimant to continue with therapy and educated her about crisis resources. (Tr. at 701). Dr. Skar gave Claimant a GAF score of 60.

Claimant presented for therapy with Ms. McQuade on February 15, 2013. (Tr. at 696-98). She continued to feel depressed over the death of her mother and was also grieving the loss of a friend with whom Claimant had been deployed. (Tr. at 696). Ms. McQuade noted Claimant's affect to be incongruent and gave her GAF score of 50. Claimant was instructed to return in two weeks. (Tr. at 697).

On March 11, 2013, Dr. Skar saw Claimant for a medication check. (Tr. at 691-93). Claimant reported that her father had died a week earlier, and she was mourning his death. Dr. Skar renewed Claimant's prescriptions and reviewed crisis resources with her. Claimant's GAF score was 60. (Tr. at 693). Claimant also saw Dr. Skar on July 19, 2013 and October 17, 2013 for medication assessments. Claimant's symptoms were essentially the same. Her medications were continued and her GAF score was 60 on both occasions. (Tr. at 853, 869).

Claimant had seven mental health visits in 2014 and one C & P examination related to her diagnosis of PTSD. At a visit on July 8, 2014, Claimant acknowledged that her symptoms had not improved and she needed "to do something different." (Tr. at 1029). She agreed to try CPT-C (cognitive processing therapy).[5] Ms. McQuade planned to begin CPT-C at the next visit. However, Claimant failed to show up at the next few scheduled appointments. (Tr. at 1085-89). At her last visit documented in the record, on November 6, 2014, Claimant admitted that she defeated her own treatment progress by quitting her

---

[5] According to the U.S. Department of Veterans Affairs website, cognitive processing therapy is skills-based therapy designed to teach a patient how to deal with the psychological effects of trauma. *See* www.ptsd.va.gov/public/treatment-therapy-med/cognitive_processing_therapy.asp

medications and stopping therapy when she was making progress. (Tr. at 1071). Claimant described herself as a train that had derailed. She was noncompliant with her physical therapies, as well as her psychological therapies, and was not exercising. Dr. Skar discussed with Claimant the importance of following her sleep apnea treatment, encouraged her to participate in the exercise program arranged for her, and renewed her prescriptions. She was instructed to continue individual psychotherapy. (Tr. at 1073).

### 2. Degenerative Disk Disease of Lumbar Spine

On March 14, 2006, Claimant was evaluated by Dr. Nagaraja Rao, a neurologist, for complaints of chronic low back pain. (Tr. at 275-77). Claimant reported that the pain had started in 2004 when she was unloading some equipment while in the service. (Tr. at 275). An MRI scan showed mild osteophyte formation adjacent to the disk margin from T10 to S1. There was minimal disk bulging, but an EMG/NCV revealed no evidence of radiculopathy. At the time, Claimant was working as a security officer. (Tr. at 276). Dr. Rao performed an examination with an emphasis on Claimant's neurological status. She had normal tone, bulk, and power in all extremities, with normal reflexes and sensation. Dr. Rao diagnosed Claimant with degenerative disk disease with disk bulgings. (Tr. at 276-77). He recommended that Claimant lose weight, do regular physical exercise, and take anti-inflammatory medications. (Tr. at 277). He opined that Claimant's condition would likely worsen over time given her age.

Claimant presented to the Neurology Outpatient Clinic on February 1, 2007 and saw Dr. Rao in follow-up. (Tr. at 610-11). Dr. Rao reviewed Claimant's MRI findings and noted that she had been taking Etodolac, but could not tolerate the side effect of "throat burning." (Tr. at 610). Claimant continued to have back pain, which was getting worse, usually at the end of the day. The pain radiated around the right knee and into Claimant's

lower leg, but she had no loss of sensation. Claimant continued to work as a security guard. (Tr. at 611). On examination, Dr. Rao did not find any abnormal neurological signs. He diagnosed Claimant with degenerative disk disease of the lumbar spine with disk bulgings and radicular symptoms, but with stable neurological findings. He prescribed Motrin 400 mg. and suggested a repeat MRI in 6-7 months.

Claimant saw Dr. Faredoon Misaghi on August 31, 2009 for chronic low back and left hip pain. (Tr. at 485-86). The location, and character of the pain had not changed, and Claimant reported satisfaction with current pain management.

On June 6, 2012, Claimant saw Dr. Taslima Mahmood for the purpose of re-establishing care. (Tr. at 340-43). She complained of low back, hip, and knee pain that had been present for ten years. Claimant attributed her pain to a fall she had suffered when working in the National Guard. On physical examination, Dr. Mahmood found Claimant's musculoskeletal range of motion in the low back and hips to be limited bilaterally, and her hand grip to be poor. (Tr. at 341). However, her neurological examination was grossly normal. (Tr. at 342). Dr. Mahmood ordered some laboratory studies, reviewed Claimant's medications, and gave her ibuprofen to relieve pain.

On September 13, 2012, Claimant Saw Dr. Mahmood and reported having fallen in her driveway, causing low back, hip, and knee pain. (Tr. at 300). On examination, her joints and range of motion were normal bilaterally, and she had no spinal or paraspinal tenderness. (Tr. at 301).

**B.  Department of Veterans Affairs Disability Evaluations and Ratings**

On June 26, 2007, Roslyn Feierstein, Ph.D., Licensed Clinical Psychologist, performed a compensation and pension ("C & P") examination for PTSD. (Tr. at 567-82). Dr. Feierstein completed a review of Claimant's records, medical history, and treatment

20

history. She noted that Claimant had been receiving outpatient Care for PTSD since October 2004. (Tr. at 568). She had never been hospitalized for psychiatric issues, but did use psychotropic medications and received individual psychotherapy. (Tr. at 569). Claimant had persistent depression, difficulty sleeping, appetite disturbance, anhedonia, and anger outbursts. Claimant's childhood had been relatively stable except that her father committed suicide when she was young. Claimant did well in school, joined the military, and received honors while in the service. (Tr. at 570-71). She was stationed in Bosnia for 6 months and Iraq for 12 months and did have combat experience. (Tr. at 571). Claimant spent additional time in the National Guard. Claimant had an eight-year old son, but was not married, and she and her son lived with her mother and stepfather. (Tr. at 572). Claimant worked for Brinks as an armored car security guard and had few friends. She had attempted suicide in the past and had thoughts of suicide, but had no current plans.

Dr. Feierstein observed Claimant to be despondent, anxious, fearful, depressed, and hopeless. (Tr. at 573). Her psychomotor activity was tense and her affect was constricted. Claimant displayed attention disturbance and described having auditory hallucinations involving the sounds of combat. (Tr. at 574). Claimant reported having panic attacks that interfered with her ability to shop and engage in recreational activities. (Tr. at 575). She also lacked motivation to exercise and put on makeup. Dr. Feierstein found Claimant's memory to be mildly impaired, with her attention and concentration being compromised. Dr. Feierstein reviewed Claimant's combat experiences that led to her PTSD and the frequency of triggers and symptoms. She determined that Claimant had not had a period of remission since the onset of the symptoms. In fact, her symptoms had increased since 2003. (Tr. at 577). Testing showed a moderate level of PTSD, and the testing was

determined to be valid. (Tr. at 578). Dr. Feierstein indicated that Claimant was employed, but she was having occupational difficulties related to PTSD, including decreased concentration, difficulty following instructions, inappropriate behaviors, and memory loss. (Tr. at 579). Dr. Feierstein confirmed the diagnosis of PTSD and gave Claimant a GAF score of 60. She felt that Claimant was showing the emergence of more severe symptoms, however. (Tr. at 580). Claimant had recently been demoted at work, had an increase in somatic complaints and worsening health conditions, was experiencing family strife, had stopped attending organized functions, and had no leisurely pursuits. Dr. Feierstein felt Claimant's prognosis was fair if she continued to receive care and re-established her social contacts. Claimant was not totally disabled due to her PTSD, but Dr. Feierstein opined that she probably should not resume her employment with Brinks due to the similarity between her job as an armored car security guard and her deployment as a military police officer. Dr. Feierstein suggested that Claimant seek another position at Brinks that would reduce the triggers. (Tr. at 581-82).

On August 1, 2007, Claimant underwent a C & P examination for a low back injury. (Tr. at 557-67). Claimant began having low back pain in 2004 after unloading some equipment while deployed in Iraq. (Tr. at 557). Before leaving Iraq, Claimant was unloading some duffle bags, and strained her back, causing pain to radiate down her right leg to her toes. (Tr. at 558). She reinjured her back in 2006 when she fell off of a Brinks truck while loading heavy coin, which resulted in her being off of work for three months. (Tr. at 558, 566). Since then, her back pain had gotten progressively worse. Claimant stated that she currently took Aleve to reduce pain, and it provided a good response. (Tr. at 558). Claimant denied any hospitalizations related to her back injury. Her symptoms included stiffness, weakness, spasms, and pain. She described the pain as dull, aching,

and moderate, running from the T12 through the L2 area. Claimant stated that the pain was constant, occurred on a daily basis, and radiated from the top of her right thigh, over her leg, into her knee. (Tr. at 559). The radiating pain was described as a dull throbbing, although occasionally it would become a sharp shooting pain down the lateral aspect of the thigh to her knee. Claimant did not use any assistive devices, but her walking was limited by pain to less than one mile. Claimant was examined by Nurse Practitioner, Sylvia Gardner, in conjunction with Joseph Pellecchia, M.D. (Tr. at 567). They found no evidence of spasm, atrophy, guarding, pain with motion, or tenderness. (Tr. at 559-60). Claimant's posture and gait were normal, and her spine curvature was also normal. (Tr. at 560). Claimant's motor examination in every muscle was 5/5, with normal tone and no atrophy. (Tr. at 560-61). Both upper and lower extremities had normal sensation. (Tr. at 561-62). However, Claimant had hypoactive reflexes throughout her upper and lower extremities. (Tr. at 563). Range of motion testing revealed pain on active and passive flexion and extension of the thoracolumbar spine, but not on right or left lateral flexion or lateral rotation of the thoracolumbar spine. (Tr. at 564-65). Repetitive use of the spine for flexion, extension, and right and left lateral rotation resulted in pain. A lumbosacral spine x-ray series showed degenerative changes, mild scoliosis, and mild anterior compression of the L1. (Tr. at 566). Claimant was diagnosed with degenerative disk disease, mild scoliosis, and mild compression of the L1. (Tr. at 567). The anticipated effects of her impairment on occupational activities included decreased mobility, problems with lifting and carrying, lack of stamina, weakness or fatigue, decreased strength and pain in her lower extremity. In addition, her ability to do chores, shop, exercise, travel, and dress would be mildly impaired, while her impairment would prevent her ability to participate in sports. She was expected to have increased absenteeism.

On August 4, 2007, the VA issued a Ratings Decision, which provided disability ratings for three impairments alleged by Claimant. (Tr. at 171-77). First, the VA decided that Claimant qualified for a service-connected disability rating of 50% related to her diagnosis of PTSD, effective June 26, 2007. (Tr. at 171). This rating was based upon the medical evidence from the VA showing that Claimant's symptoms of PTSD had increased in severity since 2005 and caused occupation and social impairment with reduced reliability and productivity. (Tr. at 174). The VA noted that Claimant's GAF score of 60 at a recent C & P examination indicated moderate symptoms consistent with the 50% rating. Second, the VA found that Claimant had a 40% service-connected disability rating due to degenerative changes to the lumbar spine, effective June 26, 2007. (Tr. at 171). The reasons for this finding were a 2005 MRI reflecting mild degenerative changes throughout Claimant's spine, combined with evidence of chronic pain, increased stiffness, spasms, hypoactive reflexes, and a reduced range of motion. (Tr. at 174-75). Claimant's symptoms had increased since her initial assessment in 2005, when she was given a 20% rating; consequently, her rating was likewise increased. Third, the VA determined that Claimant's left knee arthralgia merited a 10% service-connected disability rating, effective April 16, 2005. (Tr. at 171). The VA acknowledged that Claimant had continued to have problems with her knee since it was first rated at 10% in 2005; nevertheless, the 2007 review did not uncover evidence sufficient to warrant an increase in the original rating. Claimant's knee symptoms had stayed essentially the same, and without signs of lateral instability, moderate subluxation, or leg extension limited to 15 degrees, a higher rating was not justified. (Tr. at 176).

On November 1, 2010, Claimant had a mental health C & P for PTSD by Jennifer Kinder, Psychologist. (Tr. at 396-409). Claimant reported episodes of depression two to

three days per week, which she connected to thoughts of Iraq and to losing her job as a supervisor at Brinks. (Tr. at 398). Claimant stated that she lost her job after missing a substantial amount of work due to feeling sick or having appointments at the VAMC. She had stopped taking her psychotropic medications because she became pregnant and felt that her symptoms had increased as a result. Claimant reported getting married in July and having an "ok" relationship with her husband. She also had one son and got along well with him and with her parents, who lived nearby. Claimant did not have many friends and tended to stay at home.

On examination, Claimant appeared appropriately dressed, but lethargic and fatigued. Her speech was slow, her affect blunted, and her mood depressed. (Tr. at 400). Claimant had a short attention span and impaired concentration. (Tr. at 400-01). Claimant complained of disturbed sleep, with dreams of being in Iraq and not being able to leave. She had auditory hallucinations, anger control issues, and ritualistic or obsessive behaviors. (Tr. at 401). Claimant reported a history of panic attacks and suicidal thoughts, although she denied any intention of committing suicide. (Tr. at 402). With respect to activities of daily living, Claimant had moderate problems with grooming and slight problems with bathing and exercising. Ms. Kinder found Claimant's remote memory to be normal, but her recent memory was moderately impaired and her immediate memory was mildly impaired. (Tr. at 403). Ms. Kinder concluded that Claimant had moderate to severe symptoms of PTSD, as well as moderate arousal and avoidance symptoms. (Tr. at 404-05). Ms. Kinder diagnosed Claimant with PTSD, chronic, and major depressive disorder. She felt Claimant's recent severe level of depression was related to her cessation of medication. (Tr. at 407). Claimant's GAF score was 50.

On November 9, 2010, Claimant underwent a C & P general medical examination conducted by William Walker, Staff Physician, for degenerative changes of the lumbar spine, left knee arthralgia, right knee tendonitis, and hypertension. (Tr. at 378-96). Claimant reported suffering an injury to her back while on duty in Iraq when she was attempting to load some heavy equipment. She claimed to have constant back pain that radiated down the right leg with certain movements. (Tr. at 379). The pain had become progressively worse, but she was not receiving any treatment for it. Claimant also complained of pain and stiffness in both knee joints and stiffness in her lower back. On examination, Claimant was noted to be morbidly obese, weighing 250 pounds at 5 feet, 4 inches tall. (Tr. at 384). Her gait was normal. Claimant's muscle examination revealed all muscle masses to be 5/5 without atrophy or spasm. (Tr. at 387). She had joint tenderness with objective evidence of pain on range of motion testing. Examination of Claimant's spinal muscles showed evidence of guarding, spasm or tenderness. Her straight leg raise was negative, but range of motion was reduced and there was objective evidence of pain on active motion. (Tr. at 387-88). Claimant's neurological and detailed motor examination were normal. (Tr. at 389-90). Dr. Walker diagnosed Claimant with minimal stable degenerative changes of the lumbar spine; osteoarthritis of the lumbar spine; minimal disk bulging T12-L1/L2; mild disk bulging L4-L5 with narrowing of the neural foramen; and radiculopathy of the right leg associated with the narrowing of the neural foramen. (Tr. at 394). Dr. Walker opined that Claimant's lumbar problems would impair her ability to lift and carry, and would affect her ability to perform some daily activities, like carrying groceries, exercising, and playing sports. He felt she was "capable of sedentary, but no physical employment due to her lumbar spine." (Tr. at 394).

On January 12, 2012, Claimant underwent a C & P examination conducted by Clifton R. Hudson, Licensed Psychologist. (Tr. at 355-63). Claimant was applying for disability benefits related to her PTSD. Claimant was found to have pre-existing diagnoses of chronic PTSD and depressive disorder, not otherwise specified ("NOS"). Her current GAF score was 55. Claimant's level of occupational and social impairment was described as "occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care, and conversation." (Tr. at 358). Claimant's symptoms of depression and PTSD were recorded and were noted to cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. (Tr. at 361). Claimant reported losing her job at an armored car company in 2010 because she was having trouble focusing and remembering things, was hyper-aroused and "jumpy;" and was distracted and fearful that her coworkers would learn that she was taking psychotropic medications and she would be fired. (Tr. at 359).

On February 27, 2014, Philip B. Hatfield, Ph.D., Licensed Psychologist, performed a C & P evaluation of Claimant for PTSD. (Tr. at 899-907). He confirmed Claimant's prior diagnoses of chronic PTSD and depressive disorder secondary to PTSD. Dr. Hatfield indicated that Claimant's PTSD caused occupational and social impairment with reduced reliability and productivity. (Tr. at 901). Dr. Hatfield reviewed Claimant's current symptoms, which included sleep disruption, avoidance behavior, hypervigilance, hyperarousal, lack of motivation, anger outbursts, and anxiety. (Tr. at 902). Claimant left her job in 2010 to avoid being fired. She had been making numerous mistakes at work, was getting frequently reprimanded, and had many absences. (Tr. at 903). Dr. Hatfield documented that Claimant had previously been evaluated for PTSD benefits in 2007,

27

again in 2010, and 2012, and was rated at 70% disabled at the time of this C & P evaluation. Claimant had regularly attended psychotherapy for her PTSD symptoms and received psychotropic medications, but continued to have persistent symptoms. In 2012, her symptoms actually increased. Claimant's PTSD caused her to have recurrent, distressing memories of traumatic events; recurrent, distressing dreams; marked physiological reactions to internal and external cues that symbolize or resemble an aspect of the traumatic event; avoidance behaviors; negative alterations in cognition; and marked alterations in arousal and reactivity associated with the traumatic event. (Tr. at 904-05). Dr. Hatfield felt the PTSD symptoms caused significant distress or impairment in social, occupational, or other important areas of functioning. (Tr. at 905).

On March 10, 2014, the VA issued a Ratings Decision, which responded to a specific claim made by Claimant in February 2014 apparently related to her PTSD. (Tr. at 163-69). The VA considered whether the disability rating assigned to Claimant's PTSD, which by that time was 70%, should be modified. (Tr. at 168). After considering the medical evidence, the VA concluded that Claimant's 70% rating was still appropriate. Claimant did not display the symptoms associated with total occupational and social impairment necessary to qualify for a 100% disability rating, but continued to have symptoms of the severity most closely aligned with the 70% rating. The VA pointed out, however, that when considering Claimant's other impairments, her overall disability rating was 90%. (Tr. at 163). Because the VA had awarded Claimant "Individual Unemployability" based on her combination of impairments, she was receiving disability benefits at the 100% rate, and her conditions would be considered permanent. Thus, Claimant's conditions would no longer be routinely reviewed in the future. (Tr. at 163, 168).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775*.*

## VII.    <u>Discussion</u>

Claimant alleges that the ALJ's decision is based on an erroneous application of the prevailing law of this circuit given that the ALJ (1) failed to afford the VA's disability ratings the requisite "substantial" weight, and (2) failed to show how the record clearly demonstrates that such a deviation was warranted. Claimant relies upon *Bird v. Commissioner of Soc. Sec.*, 699 F.3d 337 (4th Cir. 2012) in support of her request for remand.

In *Bird,* the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") discussed the role that VA disability ratings should play in the SSA's disability determination process. To begin, the Fourth Circuit confirmed the basic rule that other agency decisions, while not binding on the SSA, "cannot be ignored and must be considered" when evaluating a claimant's eligibility for social security disability benefits. *Id.* at 343 (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 n. 1 (4th Cir. 1983) and SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006)).[6] With respect to the VA, the Fourth Circuit acknowledged that it had never explicitly addressed the precise weight that the SSA should afford to the VA's disability ratings. Reviewing the law of other jurisdictions, the Fourth Circuit pointed out that varying degrees of deference had been given to the VA's determinations. The Fourth Circuit reasoned that even though courts differed on the amount of weight to give, "[t]he assignment of at least some weight to a VA disability determination reflects the fact that both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability." *Id.* The Court added, "[b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims." *Id.* (citing *McCartey*

---

[6] SSR 06-03p provides *inter alia*:

> Under sections 221 and 1633 of the Act, only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled. Our regulations at 20 CFR 404.1527(e) and 416.927(e) make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner (see also SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"). However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)). Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

*v. Massanari,* 298 F.3d 1072, 1076 (9th Cir. 2002)). Noting that "the purpose and evaluation methodology of both programs are closely related," the Fourth Circuit concluded that "a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency." *Id.* Consequently, the Fourth Circuit mandated as follows:

> [I]n making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

*Id.*

Here, the ALJ expressly considered the VA's rating decisions and decided to deviate from the presumed weight established in *Bird*, giving the ratings "little weight." (Tr. at 22). Accordingly, the ALJ was obligated to show how the record before her clearly demonstrated that such a deviation was appropriate. *See, e.g., Hildreth v. Colvin*, No. 1:14CV660, 2015 WL 5577430, at *4 (M.D.N.C. Sept. 22, 2015) ("An ALJ must 'explicitly detail the reasons for giving [a VA disability determination] less weight.'") (citing *Thomas v. Colvin,* Action No. 4:12CV179, 2013 WL 5962929, at *9 (E.D.Va. Nov. 6, 2013)); *also Wyche v. Colvin,* No. 4:13-cv-43, 2014 WL 1903106, at *8 n. 2, *10 (E.D.Va. Apr. 30, 2014) (collecting cases). To fulfill that obligation, the ALJ offered two ways in which she believed the record justified her variance. First, she found that Claimant's ability to carry out normal daily activities "including caring for young children, driving, shopping, attending medical appointments, caring for ill parents, visiting with a friend" was inconsistent with the VA's disability determinations. (*Id.*) Second, the ALJ concluded that Claimant's "regular" GAF scores of 60, which indicated "no more than moderate impairment in

global functioning," did not support the VA's ratings. (*Id.*). The ALJ explained that while she did not give "any significant weight to the claimant's GAF score," she relied upon it to the extent that it showed Claimant's "global functioning improved with treatment." (*Id.*).

The Commissioner contends that the ALJ fully complied with the *Bird* mandate because she provided specific reasons, rooted in the evidence, which validated her decision to afford less than substantial weight to the VA's disability ratings. Indeed, the Commissioner is correct that reasons were given. Nevertheless, the undersigned **FINDS** that the ALJ's decision is not supported by substantial evidence because the reasons provided by the ALJ are not clearly supported by the record, and the evidence is not otherwise "so one-sided that one could clearly decide [the question] without analysis." *Brown v. Colvin,* No. 14-2106, 2016 WL 502918, at *2 (4th Cir. Feb. 9, 2016); *see, also, Hunter v. Colvin,* No. 7:15-CV-126-BO, 2016 WL 2347094, at *2 (E.D.N.C. May 3, 2016) (finding that the ALJ's reasons for deviating from the *Bird* standard were insufficient when the reasons "were far from the clear demonstration required to give less than substantial weight to a VA disability rating.")

Looking at the ALJ's first reason, the record contains contradictory evidence regarding Claimant's ability to perform normal daily activities. Furthermore, the record indicates that Claimant's activity level varied during the four-year period between her alleged onset of disability and the date of the ALJ's written decision. However, the ALJ never addressed any changes in Claimant's behavior over time, nor the changes that were expressly mentioned by the VA's examiners in their C & P evaluations, which led to modifications of Claimant's disability ratings. Although Claimant certainly reported at various times that she drove, cared for her children and parents, shopped, attended appointments, and visited with a friend, she also expressed concern over her growing

32

difficulty with completing activities of daily living. (Tr. at 353). Claimant had suicidal thoughts, decreased energy, and depressed mood, symptoms that were all exacerbated by stress associated with her daily responsibilities. (*Id.*). Claimant had only one friend, an individual who had been in the service with her, but Claimant ultimately lost that friend when the friend suffered from "problems of her own." (Tr. at 359). Claimant also lost her long term job as an armored car security guard in 2010 due to PTSD symptoms, including reduced concentration and forgetfulness. (Tr. at 359). Claimant became anxious and hyper-aroused in crowds, causing her to limit her shopping to the off-hours. (Tr. at 363, 368). She repeatedly complained of not having sufficient energy to perform the activities of daily living, even confessing that she lacked enough energy to apply make-up. (Tr. at 402, 474, 488, 720, 855, 874, 1038). Lastly, while Claimant attended many health care appointments, she also missed numerous appointments, either because she canceled them, or she simply failed to appear. (Tr. at 334, 335, 363-65, 421, 432, 470, 495, 687, 696, 698, 701, 702, 862, 863). Consequently, while the record shows that Claimant could frequently perform activities of daily living, it also reflects significant functional limitation attributable to Claimant's PTSD and associated depression. Thus, the evidence pertaining to Claimant's daily functioning is equivocal and conflicting and does not clearly demonstrate a reason to disregard the VA's disability ratings in their entirety.

With respect to the ALJ's second reason, the mental health notes prepared by the VA providers actually undermine the ALJ's assertion that Claimant improved with medication and psychotherapy, and that her GAF scores reflect this improvement. At her initial visit in 2004, Claimant had a GAF score of 68. Although her GAF score correlated with mild symptoms, Claimant was assessed with moderate symptoms, attributed in part to her recent combat exposure and readjustment. (Tr. at 667). In 2005, Claimant's

symptoms grew worse. (Tr. at 608-610). She had become hypervigilant, socially withdrawn, and anxious. Her GAF score decreased to 62. By 2007, Claimant's GAF scores had dropped into the 55-60 range, and she was given a service-connected disability rating for her PTSD symptoms, which had not abated or improved with regular psychotherapy and medication. (Tr. at 579, 586, 593, 599). In 2008, Claimant had GAF scores of 50 at times, indicating serious symptoms. She had a diagnosis of anxiety disorder along with PTSD and experienced an increase of symptoms that resulted in hospitalization for chest pains. (Tr. at 523-24). She was transferred to a PTSD clinical treatment team for focused psychotherapy. (Tr. at 515). In 2009, with treatment, Claimant continued to have all of the symptoms of PTSD, including anxiety, depression, fatigue, auditory hallucinations, intrusive memories, hypervigilance, and nightmares. Her GAF scores were 55. In 2010, Claimant lost her job of more than 10 years, allegedly due to concentration problems. (Tr. at 416). Within a month, she married a man on a "whim" and shortly thereafter became pregnant. Claimant's GAF score in September 2010 was 50. (Tr. at 411-13). By May 2011, Claimant had delivered a baby and continued to suffer from PTSD and depression. She resumed regular medications and therapy after taking a break during her pregnancy. Her GAF score was 60. (Tr. at 375-76). In 2012, Claimant complained of an increasing inability to complete her activities of daily living. (Tr. at 353). She required more frequent psychotherapy and increased medication. Her therapist recommended that she consider evidence-based therapies. Her GAF score ranged between 50 and 60, depending upon which clinician was assigning the score. On July 20, 2012, Claimant agreed with her clinician that years of supportive therapy had provided little benefit for Claimant's PTSD symptoms. (Tr. at 319). The clinician reiterated that Claimant consider evidence-based therapy to address her persistent symptoms. In 2013, Claimant's treatment was

complicated by the deaths of her parents. (Tr. at 693, 696). Her GAF scores were 50 when assigned by her psychotherapist and 60 when assigned by her psychiatrist. In 2014, Claimant again conceded that her symptoms had not improved with supportive treatment and agreed to participate in cognitive processing therapy. (Tr. at 1029). By this time, Claimant's PTSD had a service-connected disability rating of 70%. Her psychiatrist assigned Claimant a GAF score of 60. (Tr. at 1075). Accordingly, the record does not clearly demonstrate the improvement suggested by the ALJ, or show a positive correlation between Claimant's GAF scores and her response to treatment. Consequently, Claimant's GAF scores do not provide a valid reason to reject the VA's disability ratings.

Finally, as Claimant emphasizes, neither of the two reasons provided by the ALJ for deviating from the rule in *Bird* addresses the ALJ's rejection of the VA's 40% disability rating awarded for Claimant's degenerative disk disease of the lumbar spine. Although the ALJ mentioned the 2007 VA Ratings Decision, which found Claimant to have a 40% service-connected disability rating arising from her lumbar spine, the ALJ wholly failed to directly discuss the rating or the evidence relied upon by the VA in reaching that disability rating.

At step two of the sequential process, the ALJ considered Claimant's diagnosis of degenerative disk disease of the lumbar spine and found it to be a nonsevere impairment. (Tr. at 13). The ALJ explained that Claimant had a normal lumbar spine x-ray in 2013 and a normal physical examination in 2014. According to the ALJ, these results, taken in combination with a lack of evidence showing that Claimant had "significant work-related limitations" related to her spine, formed the basis of the ALJ's step two finding. (*Id.*). After this discussion at step two, the ALJ made minimal mention of Claimant's degenerative disk disease. The ALJ never provided any focused reason for rejecting the

VA's 40% disability rating, never discussed the reasons given by the VA for determining that Claimant had a partial disability related to her back, and never reconciled clear evidence in the record that contradicted the evidence relied upon by the ALJ to find Claimant's degenerative disk disease to be a nonsevere impairment. For example, at the 2007 C & P examination performed at the VA, Dr. Pellecchia, the examiner, documented that Claimant had hypoactive reflexes throughout her upper and lower extremities, pain on active and passive flexion and extension of the thoracolumbar spine, and pain on repetitive use of the spine. (Tr. at 564-65). Claimant's x-rays showed degenerative changes, mild scoliosis, and mild anterior compression of the L1. (Tr. at 566). Dr. Pellecchia opined that Claimant's condition would cause decreased mobility, problems with lifting and carrying, lack of stamina, weakness, fatigue, and increased absenteeism, all of which could be considered work-related limitations. Moreover, Claimant had previously been advised by a neurologist, Dr. Rao, that her low back conditions were chronic and would likely worsen over time. (Tr. at 277).

In November 2010, Claimant had another C & P examination of her spine performed by VA Staff Physician, Dr. William Walker, who found Claimant to have an abnormality of her spinal muscle, such as, guarding, spasm, tenderness; reduced range of motion; objective pain on range of motion; objective pain with repetitive motion; hypoactive left ankle jerk; bulging disks; and radiculopathy of the right leg. (Tr. at 387-90). Dr. Walker diagnosed Claimant with minimal stable degenerative changes of the lumbar spine; osteoarthritis of the lumbar spine; minimal disk bulging at T12-L1/L2; mild disk bulging at L4-L5 with narrowing of the neural foramen; radiculopathy of the right leg secondary to narrowing of the neural foramen. He opined that Claimant's spinal condition would affect her occupational and daily activities, causing her problems with

lifting and carrying. (Tr. at 394). He felt Claimant was "capable of sedentary, but NO physical employment due to her lumbar spine." (*Id.*). Thus, Dr. Walker clearly believed that Claimant's degenerative disk disease caused significant work-related limitations in November 2010 that merited a disability rating of 40%.

Under *Bird,* substantial weight is the starting point for VA disability determinations. Yet, "the ALJ's decision does not indicate that ... [she] considered 'substantial weight' to be the starting point." *McClora v. Colvin,* C.A. No. 5:14–cv–441–DCN, 2015 WL 3505535, at *16 (D.S.C. June 3, 2015). The ALJ did not provide reasons for deviating from the substantial weight rule that were clearly documented by the record, and the well-accepted reasons for deviating from *Bird* did not exist in this case. The VA and the SSA were considering Claimant's disability status during overlapping time frames, with the VA conducting C & P examinations in 2007, 2010, 2012, and 2014, and the SSA assessing Claimant's conditions between June 28, 2010 (the alleged onset of disability) and October 20, 2014 (the date of the ALJ's written decision). Likewise, the SSA and the VA were considering the same chronic impairments when determining Claimant's disability claims. As such, the ALJ erred by failing to apply the correct evidentiary standard to the VA's disability ratings, and the record does not clearly justify the deviation.

Although the ALJ's error ultimately may prove to be harmless given her detailed and individualized RFC finding, the Court is not in a position to make that determination. Assessing the weight and effect of each of the VA's disability ratings, taken separately and in combination; assessing the weight and effect of the VA's decision to award Claimant "individual unemployability" benefits at the 100% rate, even though Claimant's total disability rating was less than 100%; assessing the weight to be given to the medical source

opinions expressed in the C & P evaluations; and reconciling conflicting evidence and opinions are not tasks within the province of the Court. Because the ALJ failed to thoroughly perform these responsibilities, the undersigned **FINDS** that the ALJ's decision should be remanded so that the VA's disability ratings can be given adequate consideration.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 7), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 10); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings to fully analyze and weigh the disability ratings decisions of the Department of Veterans Affairs and their bases pursuant to *Bird v. Commissioner of Soc. Sec*; and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of

such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 3, 2016

Cheryl A. Eifert
United States Magistrate Judge